# EXHIBIT
# "B"

Donald J. Winder (#3519)
Edwin W. Christensen (#9422)
WINDER & HASLAM, P.C.
175 West 200 South, Suite 4000
PO Box 2668
Salt Lake City, UT  84110-2668
Telephone: (801) 322-2222
Facsimile: (801) 322-2282

Richard D. Burbidge (#0492)
BURBIDGE & MITCHELL
215 South State Street, Suite 920
Salt Lake City, UT 84111
Telephone: (801) 355-6677
Facsimile: (801) 355-2341

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LAYNE MORRIS, an individual; TABITHA SPEER, in her own right; TABITHA SPEER, as Executrix of the ESTATE OF CHRISTOPHER SPEER; and TABITHA SPEER on behalf of her minor children TARYN SPEER and TANNER SPEER,<br><br>        Plaintiffs,<br><br>v.<br><br>AHMAD SA'ID KHADR, an individual, a.k.a AHMAD SAID KHADR, a.k.a. AHMED SAID KHADR, a.k.a. AL-KANADI, a.k.a. ABU ABD AL-RAHMAN,<br><br>        Defendants. | **AFFIDAVIT OF LAYNE MORRIS**<br><br>Civil No.: 2:04CV00723<br><br>Judge: Paul G. Cassell |

STATE OF UTAH          )
                                        :ss
COUNTY OF SALT LAKE  )

        I, Layne Morris, being first duly sworn under oath, depose and state as follows:

1.        I am a resident of the state of Utah and am over the age of eighteen.

2.      The information contained in this affidavit is true and is based upon my own personal knowledge.

3.      I am preparing this Affidavit in an effort to give a flavor of what my life has become. That is, some background as to who I am and how I was raised, what my goals, dreams and ambitions were and how my life was irreversibly altered by the events of July 27, 2002.

4.      I was born in Seattle, Washington in 1962, the second oldest of four boys. As my father was employed by the United States State Department, we traveled extensively both throughout the United States and the remainder of the World. I can remember living in Michigan, Virginia, Utah, as well as Thailand and Jamaica, to name a few.

5.      During these formative years, and as a result of traveling both nationally and internationally, I developed a great appreciation for the democratic lifestyle we enjoy in the United States. Additionally, the constant relocating instilled in me a strong sense of family values, as it seemed many times that family was all I had.

6.      As a child, I was an athletic boy constantly playing ball, running, jumping, wrestling and climbing trees with my brothers. Not only was I an athletic boy, but as a result of the values instilled in me by my parents, I developed a strong sense of appreciation for the importance of academics.

7.      By virtue of this value system, I was able to do quite well academically, despite the upheaval of numerous moves which required attendance at multiple schools.

8.     When I was eighteen, I was delighted to be accepted to Ricks College in Rexburg, Idaho, which I attended from 1980 to 1981.

9.     It was during this time that I began to get a sense there was a higher purpose in life than simply matriculating in a sterile academic setting.

10.     Additionally, as a result of traveling abroad combined with a strong value system instilled by my family, I developed a strong sense of God and country.

11.     While at Ricks College I realized I had a different calling in life than simply pursuing academics in a university setting. As such, I was honored when I was selected by my church to perform a two year mission to spread the Gospel. I was surprised to realize that during this time-frame, from 1981-1983, I was the one that would experience the greatest growth. While I was successful in conveying the message of God to a great many people, I found that I was tremendously enriched by the opportunity to speak to people with different viewpoints, value systems and other cultural differences. I found this experience helped me to grow enormously, both spiritually and intellectually.

12.     At the end of this mission, I was fulfilled spiritually. However, I still felt compelled to give back to my country. It was my dream to support the greatest nation in the world, something I came to appreciate during my international travels.

13.     As such, in 1984 I enlisted with the United States Army in the Field Artillery Division. I was both surprised and delighted to learn this was an endeavor in which I excelled. During basic training at Fort Sill, Oklahoma, I graduated first in my class. Motivated by my

3

success in basic training as well as an innate sense of adventure developed while growing up with three brothers I requested to be transferred to the Special Forces Unit. After successfully completing special forces training, I returned to my chosen home-state, Utah, to serve in the Springville, Utah, National Guard Unit.

14.    Shortly thereafter, I decided to further my educational studies and began attending Brigham Young University.

15.    In 1986, while attending school, I met a beautiful woman, Leisl, who ultimately became my wife.

16.    During the early years of our marriage, my wife and I were able to enjoy the many spectacular bounties that Utah provides. We lived a loving, active life as best friends and regularly hiked, biked and camped.

17.    Upon graduating from Brigham Young University in 1989 with a degree in Cartography, I accepted a position with the United States Geological Survey. To this point, my life had in many ways been incredibly fulfilling. I would have characterized myself as an athletic, active, happily married young man who had been blessed to receive a quality education and provide service to both God and country. In short, I did not think my life could be any better.

18.    Between 1990 and 1994, my wife and I were blessed with three sons, Tyler, Paul and Colton, as well as a daughter, Kyah.

4

19.    In 1995, I accepted a position with West Valley City, Utah, in the Public Works Department as an Engineering Technician.  It was at this point, I settled into the comfortable routine of holding a job, being a positive influence in the community and raising my children.

20.    Over the next seven years, through 2002, I was fortunate to enjoy professional success, all the while being able to see my children grow.  I was able to see each of my children take their first step and develop different personalities.  One of my boys developed into a fine cross-country runner, one developed into a dedicated soccer player, the other loves to play all sports, but especially basketball.  My daughter was a girl, through and through, wearing frilly dresses, that type of thing.

21.    In early 2002, little did I know it, but my life was about to be irreparably altered.  It was at this time the National Guard "called-up" my Unit, the 19th Special Forces Unit for deployment to Afghanistan.

22.    After mobilization and deployment, my Unit was dropped in Khost, Afghanistan in May 2002.  As one might imagine, during this timeframe I was extremely nervous.  The idea of leaving my family behind was devastating to me.  When I realized that I was going to be deployed to Afghanistan, the fear that I would never see my children again was almost overwhelming.  Yet upon deployment, surprisingly, I began to realize there was an element of me that was alive.  While I certainly would have preferred to have been at home with my wife and children, bouncing my daughter on my knee, going to football games with my kids and hiking with my wife, I was honored to serve my country. Additionally, in light of the tragedy of

9-11, I felt I was fulfilling something that had been instilled in me almost from birth. I was able to be in a position where I could serve my country, protect my children, provide my family with a sense of security when they went to sleep at night and actually serve a purpose to better this world. Unfortunately, this would all to come crashing down.

23.     In July 2002, my Unit received intelligence that suspected Al Qaeda operatives or foreign fighters were in the area.

24.     My Unit went to the location to determine if the information regarding the intelligence was credible.

25.     We arrived at a small village located only ten miles from our current encampment. It looked like something out of the stone-age. It was a village with approximately twenty-five mud houses on each side of the road, nothing more than a small farm township.

26.     Upon inspecting the location, we discovered an individual who had been building land mines for remote detonation for the purpose of killing Americans.

27.     This man was in a wheelchair, having apparently accidentally discharged a mine shortly prior to our investigation. After completing inspection of this area, my commander ordered me to take fellow soldiers and go and inspect another mud building which intelligence had suggested might contain other Al Qaeda operatives or foreign fighters.

28.     As we crossed a wheat field toward the mud building, we approached a mud wall approximately eight feet tall, square in shape with a square footage of approximately one-third acre.

29.     Just before reaching the compound, I was able to see through the cracks in the metal doors, five to six men who were well nourished and well dressed. This suggested to me they were not local villagers. They were holding semi-automatic rifles and sitting around a fire. As we approached the metal doors, an elderly man, surreptitiously asleep under a tree, awoke and began yelling at us. I did not understand what he was saying, but he seemed hostile. I saw the men inside scrambling to their feet and preparing to fight. I soon realized that the elderly man was warning the men inside the compound of our presence.

30.     I radioed to my commander and indicated we needed to investigate. He stated he would send backup as soon as possible. While waiting, eventually a number of military personnel arrived in support.

31.     After this, we attempted to have the men inside come out so we could speak with them. We obtained the assistance of local villagers to speak to the men inside in various Afghani dialects.

32.     The men inside the compound refused to answer and remained quiet. It was then decided we had no alternative but to go inside and detain the men and determine their status.

33.     Ultimately, two of our interpreters agreed to go into the compound to speak with the men inside, while we provided cover.

34.     The two Afghan men entered the compound and began speaking to the men inside to determine their status.

35.     Without warning, the terrorists inside sprang up over an inner wall and shot the two Afghan men point blank in the head, killing them instantly.

36.     The men inside then began firing their rifles and throwing hand grenades over the outer walls of the compound at us.

37.     Grenades were exploding everywhere and bullets were raining down.

38.     I began running for cover and noticed one of my colleagues had been stunned by a grenade. I turned, returned to him and dragged him behind a small mud house approximately twenty feet away from the front of the compound. There was no way I could leave my comrade behind.

39.     I crouched down behind the mud building for cover and as I raised my rifle to return a grenade round, I felt an unusual recoil to my rifle.

40.     At that moment the sight in my right eye went dark.

41.     At first I did not know what had happened. I quickly realized I was shot in the head. While I immediately thought I was going to die, it is interesting that this was not my overwhelming thought. Thoughts of my wife and my kids flooded my mind. I had promised my children I would be home and I was overwhelmed by the sadness that my children's final memory of me would be telling them a lie. I was amazed to find that specific events ran through my head. That I would never see a boy pin a flower to my daughter's prom dress. That I would be unable to walk my little girl down the aisle. That I would not be able to lead my sons on the path to manhood. That I would never see Tyler swing a baseball bat. That I would never see

8

Paul go on a first date. That I would not be able to teach Colton how to drive a car. These were the types of things that went through my head.

42.   I wondered how my wife would cope without me. We share such a loving relationship and are best friends. I was devastated that I would not get to hold my family one last time before I died.

43.   The thought of my wife and children breaking down at the sight of military personnel stepping onto the porch of my house in South Jordan was unbearable.

44.   The sight of blood all over my chest and pooling on the ground brought me back to reality. I used my hands to feel by the right side of my nose. I could feel a hole between my right eye and my nose going into my eye socket where shrapnel had entered my head. There was no pain, I was either in shock or all of the nerve endings were cut by the shrapnel, I thought to myself.

45.   While I fought back the overwhelming urge to vomit, I realized I had to take cover and stay alive until military personnel could extract me from the area. That is, if I didn't die.

46.   Finally, after nearly two hours, which at the time seemed like years, I was extracted by a military medical helicopter to Bagram, Afghanistan.

47.   When I arrived at Bagram, I was in extraordinary pain, both mental and physical. The throbbing in my eye and the side of my head was devastating. It was like an elephant was stomping on my head. Of even greater significance, was the fact that I felt an overwhelming

chasm of unbearable sadness. I was transferred immediately to Ramstein Air Base, Germany for surgery. However, despite my tenuous grasp to life, the military surgeons declined to perform surgery due to the seriousness of the injury.

48.    I was then transferred to Hamburg University Hospital where the surgery transpired. At this hospital, the surgeons drilled a hole in the right side of my skull next to the eye-socket to remove shrapnel. The shrapnel had entered my skull between my right eye and nose, bounced off the corner of my inside eye-socket towards the outer portion of my eye-socket and severed my optic nerve.

49.    I suppose at some level the surgery was a success as the shrapnel was removed. A success that is, if you can overlook the fact that I am now completely blind in my right eye, have two permanent titanium plates in my skull, a scar around my right eye and no feeling on the right side of my face.

50.    As a result, I have significant balance problems. Even the simplest chores of daily life are impossible. I cannot get on a ladder without losing my balance. I am unable to perform even simple repairs on my home because of a lack of balance and a lack of depth perception.

51.    I am grateful to be alive and back in the United States. Nevertheless, my life has been irreparably and permanently changed. The things that held the greatest significance for me, playing catch with my children, hiking, biking, climbing, camping and skiing with my family are

things that I can no longer enjoy. Even the simplest tasks, such as driving a car, are extremely difficult and basically unsafe as I have terrible depth perception.

52.     I recently was discharged from my military duties due to my medical condition. As a result of this terrorist's grenade in Afghanistan, I have had some of the most significant elements of my very fiber traumatically stripped from me.

53.     I am no longer able to enjoy an active physical lifestyle and am no longer able to serve my country at a time when I sincerely believe I could be of use. This hurts me far more than the $8,000 per year I have lost in terms of wages from military services. I was only forty years old at the time of my injury. I would have remained with my National Guard Unit until I was at least sixty-five years old, if permitted.

54.     While my wife and children are most understanding, it affects me to the very core to have to explain to them why many of the things we used to take for granted are no longer a part of our life and never will be again.

55.     In terms of contemplating damages, that is something that is very difficult for me to do. There is no amount of money that would make what I have experienced worthwhile. There is no sum I could be paid that would fairly compensate me for the pain and suffering I have endured. There is certainly no sum of money that could compensate me for the look I see in the eyes of my wife and children when they look at my broken state. There is no amount of money I would not pay to set the clock back to the day before this assassin butchered me. In trying to quantify my damages, the only thing I can equate this to is the job market. If I ran a

classified ad and the description for employment was a job that lasted twenty four hours a day, seven days a week, three hundred sixty five days a year and the job requirement was to endure physical and mental anguish, abstain from the simplest activities enjoyed by my family and tolerate the pity of friends and strangers alike, I would submit no one would apply for that position at any price. This is the lot that has been cast for me. I certainly feel ten million dollars in on the low side of what is fair and reasonable for what I have endured.

DATED this 11 day of November, 2005.

_____
LAYNE MORRIS
Affiant

SUBSCRIBED AND SWORN TO before me this 11 day of November, 2005.

_____
NOTARY PUBLIC
Residing at Salt Lake County

Notary Public
EDWIN W. CHRISTENSEN
11441 Sage Mesa Drive
Sandy, Utah 84094
My Commission Expires
September 25, 2007
State of Utah

12